## C. C. SLAUGHTER CATTLE CO. v. PASTRANA. (No. 1037.)*

(Court of Civil Appeals of Texas. El Paso. Dec. 18, 1919. On Rehearing, Jan. 15, 1920.)

1. MASTER AND SERVANT ⬦1—RELATIONSHIP ARISES ON CONTRACT, EXPRESS OR IMPLIED.

The relationship of master and servant arises upon a contract, express or implied, between the master, on the one hand, and the servant, on the other.

2. CORPORATIONS ⬦503(2)—VENUE IN PERSONAL INJURY ACTION BY EMPLOYÉ OF CORPORATION MAY BE LAID WHERE CONTRACT EXECUTED.

Where a contract of employment, made by a corporation with its employé, is made in a certain county, venue of a personal injury action against the corporation is properly laid in such county, within Rev. St. 1911, art. 1830, § 24, providing that an action against a corporation may be brought in the county in which the action arose.

3. MASTER AND SERVANT ⬦363—WORKMEN'S COMPENSATION; EMPLOYÉ ENGAGED IN INCIDENTAL FARMING OPERATIONS "FARM LABORER."

Although a corporation is mainly engaged in cattle raising, with farming as a side issue, an employé injured while performing labor for the corporation in its farming operations, or in furtherance thereof, would be a "farm laborer" within Workmen's Compensation Law (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1, 5246—2).

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Farm Laborer.]

4. MASTER AND SERVANT ⬦418(6)—WORKMEN'S COMPENSATION; FINDING THAT SERVANT IS NOT FARM LABORER WILL NOT BE REVERSED UNLESS EVIDENCE INSUFFICIENT.

A judgment in a personal injury action that the servant was not a farm laborer within the Workmen's Compensation Act must stand on appeal, unless the evidence is insufficient to support it, in view of Rev. St. 1911, art. 1985.

5. EVIDENCE ⬦13—COURT WILL TAKE JUDICIAL NOTICE OF NATURE AND HABITS OF PRAIRIE DOGS.

The Court of Civil Appeals takes judicial notice that prairie dogs are great pests upon the cattle ranches of Western Texas, that they eat the grass and are otherwise objectionable, and that cattlemen wage a constant warfare upon them.

6. MASTER AND SERVANT ⬦363—WORKMEN'S COMPENSATION; EMPLOYÉ POISONING PRAIRIE DOGS FOR RANCHER NOT A "FARM LABORER."

A servant employed to poison prairie dogs for his employer, who was engaged in cattle raising and incidentally conducting farm operations, held not a farm laborer within the Workmen's Compensation Law (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1, 5246—2).

7. MASTER AND SERVANT ⬦297(1)—FINDINGS SUFFICIENT BASIS FOR JUDGMENT FOR SERVANT INJURED BY EXPOSURE TO WEATHER.

In a servant's action for injuries from exposure to cold while lost on the prairie, findings that the master by the exercise of ordinary care should have known of the servant's danger in time to have saved him from the consequences of severe weather, that failure to use such care was the proximate cause of the injuries, and that he was negligent in failing to send some one to hunt for plaintiff, held sufficient to form a basis for a judgment for plaintiff.

8. MASTER AND SERVANT ⬦125(7)—FAILURE TO SEND SEARCH PARTY AFTER SERVANT LOST IN BLIZZARD NEGLIGENCE.

In an action by the servant of a cattle company for injuries due to exposure and frostbite while lost in a blizzard, evidence that plaintiff was sent on an errand to a ranch 32 miles away, and became lost, but was subsequently overtaken by defendant's president and general manager, directed anew, and instructed to meet them at a designated camp, which, however, the latter left without sending out a search party after plaintiff was 1½ hours overdue and not in sight, when darkness and a blizzard were approaching, held to show negligence.

9. MASTER AND SERVANT ⬦125(6) — KNOWLEDGE OF ABNORMAL DANGERS WHICH MAY BE ACQUIRED BY EXERCISE OF CARE EQUIVALENT TO ACTUAL KNOWLEDGE.

Actual knowledge by the master as an element of liability for personal injury is not essential, but knowledge of an abnormal danger which a master might and should have acquired by the exercise of ordinary care, as an element of liability, stands upon precisely the same footing as actual knowledge.

10. MASTER AND SERVANT ⬦404—CHARTER OF EMPLOYER ADMISSIBLE TO SHOW NATURE OF BUSINESS.

In a servant's action against a cattle corporation for injuries due to exposure to weather while lost upon the prairie, the charter of defendant was admissible to show that it was running a cattle ranch, and not a farm, notwithstanding that it also showed the corporation to be a million-dollar one.

11. MASTER AND SERVANT ⬦272—EMPLOYER'S CHARTER ADMISSIBLE TO SHOW CAPACITY OF PERSON IN CHARGE OF BUSINESS.

In a servant's action for injury while lost, the employer's charter was admissible to show that the person in charge of business was a director.

12. TRIAL ⬦85—OBJECTION TO EVIDENCE AS A WHOLE PROPERLY OVERRULED WHERE PARTLY ADMISSIBLE.

Where in a servant's personal injury action a general objection was made to the admissibility of the employer's charter as a whole, the objection was properly overruled, where the charter was admissible in part.

13. TRIAL ⬦133(6)—ARGUMENT OF COUNSEL HELD HARMLESS ERROR IN VIEW OF INSTRUCTIONS TO DISREGARD.

In a servant's action for injuries, argument of counsel as to an issue submitted respecting a

plea of privilege *held* harmless, where the venue .was nevertheless properly laid, and court instructed to disregard such improper argument.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Action by Cruz Pastrana against the C. C. Slaughter Cattle Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Hudspeth, Wallace, Harper & Berkshire, of El Paso, for appellant.

Lea, McGrady, Thomason & Edwards, M. M. Winningham, and R. W. McConnell, all of El Paso, for appellee.

HIGGINS, J. Appellant, hereinafter designated company, is a private corporation incorporated under the laws of Texas; the purpose for which it is incorporated being "the raising, buying, and selling of live stock." It owns and operates a ranch of about 250,000 acres of land in Hockley and Cochran counties in the plains country of Texas, near the town of Lubbock.

It appears that upon this ranch it is also engaged in farming operations, and is likewise so engaged upon a ranch owned by it in New Mexico. These farming operations, while quite extensive, are "side issues" according to the evidence; the main business of the company being that for which it was incorporated. Upon the dates mentioned herein R. L. Slaughter was a director and president of the company. John Lemon was its general manager in charge of its ranch properties and business in the counties aforesaid. In January, 1918, Slaughter, in El Paso county, Tex., entered into a written contract with appellee, Pastrana, whereby the latter obligated himself to work on Slaughter's ranch near Lubbock for three months; "the work to be done being poisoning ground squirrels and other work which is offered and which is customary on a ranch." This contract was signed by Slaughter and Pastrana. At the same time and place Slaughter employed a number of other Mexicans for the same purpose. In employing these laborers Slaughter was acting under the instructions of the company's general manager, Lemon. The ranch designated in the contract was in fact the ranch of the company, and in making the contract Slaughter was acting for and in behalf of the company, which was his undisclosed principal. Slaughter conducted the party of laborers to Lubbock, whence they were taken to what is known as the "Zavalla ranch" of the company. There the party was placed under the control of Mike November, appellant's foreman in charge of killing prairie dogs (ground squirrels). At the Zavalla ranch there was not enough grain to kill the dogs. After the arrival of the party at the Zavalla ranch, Lemon instructed November

to send Pastrana to the main headquarters ranch house to procure the necessary supply of grain and bring it to the Zavalla ranch. Pastrana was to also bring back some bedding for the use of the party. In accordance with these instructions, and upon the day after the arrival of the party at the Zavalla ranch, November started Pastrana to the headquarters ranch house for the purpose aforesaid. This was about January 8th. Pastrana was accompanied by two other members of the party of laborers, and, according to the testimony of November, these other two went without his knowledge or consent. The headquarters house was about 30 or 32 miles distant from the Zavalla ranch. The road led first to what is designated in the evidence as the "dead cow tank," so called because at the time there was a dead cow there; thence to the "cowboy camp"; thence to the headquarters house. According to the testimony of defendant's witnesses, the road was very old, frequently traveled and plain the whole distance. According to the testimony of Pastrana and Sanchez, who accompanied him, the road was not plain, and they had difficulty in following it. Between the Zavalla ranch and the dead cow tank there is a branch road which goes by Boyd's ranch house, but it leads back into the direct road to the tank. This branch is not the direct road and is about 2 miles longer. Pastrana started upon the journey during the forenoon in an open wagon drawn by mules furnished by the company. He was furnished by November with a sketch of the road with full instructions as to the direction in which the headquarters house was situate and as to gates, windmills, tanks, etc., along the road. After the party left the Zavalla ranch, the general manager, Lemon, the president, R. L. Slaughter, and a Dr. Veale, arrived in an automobile at said ranch and had lunch there. After lunch they departed in the automobile en route to the cowboy camp, where Dr. Veale was to vaccinate a herd of cattle. At about 2:30 p. m. they overtook Pastrana and his companions about a mile and a quarter before reaching Boyd's ranchhouse. Pastrana had gotten off the main and right road which November had started him on and had taken the branch which led by Boyd's. At the time Pastrana was thus overtaken he had traveled only about 12 or 14 miles. The automobile stopped, and a conversation ensued between Pastrana and Slaughter in the immediate presence of Lemon and Dr. Veale. According to the testimony of Pastrana and Sanchez, the former told Slaughter they were cold, hungry, and lost, and requested him to send some one to meet and guide them to their destination; that Slaughter told them to follow his automobile tracks to the dead cow tank, where he would wait for them, and but for this

promise they would have stayed at Boyd's house to which they were then going. According to the testimony of Slaughter, Lemon, and Dr. Veale, no such conversation occurred, but Slaughter in a mild way reprimanded Pastrana for traveling so slowly, and likewise his companions for being with Pastrana, stating to them they had no business there and their presence was unauthorized. The testimony of the members of the automobile party was then to the further effect that Slaughter told Pastrana to hurry along, and when he got to a tank where there was an iron trough he would find a dead cow therein, and for him to unhitch the mules and pull the cow out, and that he further told Pastrana he had wasted too much time to reach headquarters, but there was a camp five miles beyond the tank where he was directed to stop for the night, and was told they would be cared for by the party there in charge; that he told Pastrana to follow his tracks to this camp and he would put obstructions in any road that led off; further that he questioned Pastrana to see if he knew directions, and Pastrana correctly pointed to north and northwest and exhibited the sketch of the road furnished by November. The camp thus referred to by Slaughter was the cowboy camp where the vaccination was to be done by Dr. Veale. Slaughter and his companions left Pastrana and went first to the tank, where they decided not to intrust the removal of the cow to Pastrana, and did it themselves. They then went to the cowboy camp, where Dr. Veale and Lemon vaccinated the cattle, and thence to the headquarters. Pastrana drove to the dead cow tank. In leaving there he got on the wrong road and became lost. He came back to the tank, and it was then dark. He then attempted to find his way back to the Boyd ranch, but was unable to do so. Subsequent to the departure of the automobile party from Pastrana a blizzard came on, and Pastrana and his party wandered lost for two nights and one day. The evidence is conflicting as to the hour the weather changed and the blizzard came up, but in any event it was very shortly after the automobile party left the cowboy camp. Slaughter testified that the first blast of the blizzard occurred just as they reached the headquarters. Upon the second day Pastrana and Sanchez regained the Boyd ranch. In the meantime the third member of the party had perished of cold, and Pastrana and Sanchez had their limbs and hands frozen. As· a consequence Pastrana lost both feet and most of his fingers upon' both hands. He brought this suit in El Paso county against R. L. Slaughter and the company to recover damages resulting from his injuries. The company claimed the privilege of being sued in a county other than El Paso.

By agreement the plea of privilege was tried along with the merits of the case. The cause was submitted upon special issues, and upon the findings made judgment was rendered in Pastrana's favor against the company for $10,000. No recovery was had against R. L. Slaughter. Facts and evidence in the case not shown by the foregoing statement will be indicated in the course of the opinion.

## Opinion.

The first assignment complains of the overruling of appellant's plea of privilege.

[1] Under section 24, art. 1830, R. S., suits against private corporations may be commenced in any county in which the cause of action, or a part thereof, arose. Appellee's cause of action arises out of the relationship of master and servant existing between appellant and himself. Such a relationship arises upon a contract, express or implied, between the master, on the one hand, and the servant, on the other. So. Pac. Co. v. Wellington, 36 S. W. 1114; Marshall v. Sirman, 153 S. W. 401; 18 R. C. L. 493. In this case the relationship arose between appellant and appellee by virtue of the written contract of employment entered into between appellee and R. L. Slaughter, which the undisputed facts disclose was made in El Paso, and that in making the same Slaughter was acting for and on behalf of appellant and was thereunto authorized. The duties imposed by law upon the master in favor of the servant by this contract were thus imposed upon appellant in favor of appellee. Appellee predicates his suit upon the breach of a duty owing to him by his master, and his suit is primarily founded upon the contract of employment.

[2] The contract having been made in El Paso county, a part of appellee's cause arose there, and the venue was properly laid in that county. Under the authorities this is well settled. Phillio v. Blythe, 12 Tex. 127; Commission Co. v. Hart (Sup.) 20 S. W. 131; Mangum v. Milling Co., 95 S. W. 605.

In answer to questions 4 and 23 the jury found that plaintiff loitered on the road before meeting Slaughter, or thereafter before he arrived at the dead cow tank, and that he was negligent in so doing, which proximately caused or contributed to his failure to arrive at the cowboy camp or headquarters ranch; further, that plaintiff, with the information possessed by him, in the exercise of ordinary care, should have completed his journey prior to any change in the weather which could or would endanger his safety.

It is alleged and proven that appellant had in its employ more than three employés in its business.

Under the second assignment of error the proposition is presented that this finding of contributory negligence upon appellee's part

precludes his recovery. In the first section of the Workmen's Compensation Law it is provided that in an action to recover damages for personal injuries sustained by an employé in the course of his employment it shall not be a defense that the employé was guilty of contributory negligence; and the second section provides that the provisions of the act shall not apply to actions to recover damages "for the personal injuries * * * sustained by domestic servants, farm laborers. * * *" articles 5246—1 and 5246—2 Vernon's Sayles' Stat. 1918 Supp.

It is insisted by appellant that Pastrana was a farm laborer, and therefore the provisions of the Compensation Law are inapplicable, and he is precluded from a recovery by reason of his contributory negligence under the rule at common law. In support of its contention that this action is exempted from the operation of the Compensation Law appellant cites a number of authorities from other states. Some of these have no application for the reason that the exception clauses of the laws there considered are much broader than the second section of the Texas act. From the report of the cases this seems to be true of the laws of California and Iowa and possibly other states. The conclusions reached in the other cases cited are in harmony with the view entertained by this court.

[3] The purpose for which appellant was incorporated and the business in which it was principally engaged has been heretofore indicated. It was typical of those operations in this state upon a large scale commonly known as the cattle business. Appellant was owning and operating a cattle ranch. In this state no one would have regarded it as a farmer or its properties as a farm. The raising of cattle is frequently incidental to farming operations just as farming operations are sometimes incidental to the cattle raising business. The two businesses are of a kindred nature, but in this state have well-recognized, definite, different meanings. They are regarded as separate and distinct occupations. The distinction between farm and ranch labor has been expressly recognized by our Legislature at its thirty-sixth regular session in the eighteenth section of chapter 160, p. 305, which excepts from the operation of that law "those engaged as domestic servants, nurses, student nurses, farm or ranch labor. * * *" The evidence in this case discloses that the farming operations of appellant were "side issues." While its farming was thus incidental, yet, if appellee at the time of his injury was performing labor for appellant in its farming operations or in furtherance thereof, then we think he would be a farm laborer, and the provisions of the Compensation Act would have no application. Shafer

v. Parke, Davis & Co., 192 Mich. 577, 159 N. W. 304, cited by appellant.

[4] But we do not regard a farm laborer and a cattle ranch laborer as one and the same thing. The one is employed in operations pertaining to the tillage of the soil, raising crops, and reaping the fruits; the other in operations which, as conducted in this state, are usually entirely independent of such tillage and production. The judgment of the court in this case implies a finding that the plaintiff was not a "farm laborer" within the meaning of the act, and this finding must stand unless the evidence is insufficient to support the same. Article 1985, R. S.

[5, 6] Appellee was employed to poison ground squirrels and other work customary on a ranch. At the time of his injury he was going after grain to be used in poisoning the dogs, and incidentally to bring back bedding for the use of the party which had been employed to do that work. This court judicially knows that prairie dogs are great pests upon the cattle ranches of Western Texas; they eat the grass, are otherwise objectionable, and cattlemen wage a constant warfare upon them. The work of exterminating them certainly pertains more to the cattle-raising industry than to farming operations. We are therefore of the opinion that appellee was not a farm laborer and not engaged in farm labor at the time of his injury. This is especially true in view of the absence of any evidence that appellee's task at the time of his injury was in any wise connected with the farming operations of appellant. Upon the view indicated Pastrana is entitled to the benefit of the Compensation Law, and, since his employer was not a subscriber under the law, it cannot avail itself of the defense of contributory risk.

Under the third assignment it is insisted that the answers to questions 13, 14, and 15 are in such conflict with the answers to questions 3, 4, and 5, requested by the plaintiff, that a judgment could not properly be rendered for the plaintiff. These questions relate to issues of negligence. This may be conceded, but the answers became immaterial in view of the answers to other questions relating to other negligent acts on the part of appellant. These other findings were made in response to questions 16, 17, 18, and 19, submitted by the court, and Nos. 1 and 2, asked by the plaintiffs. These latter findings were independent of, and not in conflict with, those first mentioned.

[7] By these latter findings it was established that after reaching the dead cow tank plaintiff and his companions lost their way; that appellant by the exercise of ordinary care should have known in time to have saved him from the consequence of severe weather that he had probably lost his way, and defendant failed, after such knowledge,

to use ordinary care to save plaintiff from the consequences of such severe weather, and such failure was a proximate cause of plaintiff's injuries; further, that defendant failed to use ordinary care and was negligent in failing to send some one back from the cow camp to hunt for or meet plaintiff and pilot him in to the cow camp or headquarters ranch on the afternoon or evening of the vaccination of the calves at the cow camp by Dr. Veale and Lemon, and such failure and negligence was a proximate cause of plaintiff being caught out in the cold and his limbs frozen. These findings do not conflict with those to which the appellant refers, nor with any others, and form a proper basis for the judgment rendered. Hill v. Hoeldtke, 104 Tex. 594, 142 S. W. 871, 40 L. R. A. (N. S.) 672; Railway Co. v. Berthea, 179 S. W. 1087; Transportation Co. v. Winters, 193 S. W. 369.

The fourth assignment is as follows:

"Because the court erred in rendering judgment for plaintiff in any sum, the jury having found that the defendant R. L. Slaughter was guilty of no act of negligence, and that defendant C. C. Slaughter Cattle Company was not guilty of any act of negligence in any respect, unless it was guilty of negligence in failing to send some one from the cow camp back to hunt for and meet plaintiff and pilot him to the cow camp or headquarters ranch. There is no evidence that said defendant, or any person representing it, knew or was apprised that plaintiff, through his own negligence, had become lost and was in danger, and, in the absence of such knowledge on the part of defendant, no duty devolved upon said defendant to send any one in search of plaintiff, and the court should grant the defendant a new trial in this cause."

The supporting proposition reads:

"The jury having found, in answer to the special issues, that the plaintiff, through his own want of care and negligence, became lost and failed to reach his destination, and thereby suffered serious injuries, and there being no evidence that the defendant, or any of its agents, knew or were apprised of the fact that plaintiff, through his own negligence, had become lost and was in danger of suffering serious injuries, and in the absence of such knowledge on the part of defendants, no duty devolved upon the defendants to send any one in search of plaintiff, and for this reason the court erred in rendering the judgment for the plaintiff."

In the first place it is broadly assumed that plaintiff by his own want of care and negligence became lost and failed to reach his destination. We do not regard the findings of the jury as supporting this broad assumption, but, however this may be, under the other findings of the jury, considered in the light of the evidence, the court properly rendered judgment for the plaintiff. As has been heretofore stated, the jury found that after reaching the dead cow tank plaintiff and his companions lost their way; that appellant by the exercise of ordinary care

should have known in time to have saved him from the consequences of severe weather that he had probably lost his way, and defendant failed, after such knowledge, to use ordinary care to save plaintiff from the consequences of such severe weather, and such failure was a proximate cause of plaintiff's injuries; further, that defendant failed to use ordinary care, and was negligent in failing to send some one back from the cow camp to hunt for or meet plaintiff and pilot him in to the cow camp or headquarters ranch on the afternoon or evening of the vaccination of the calves at the cow camp by Dr. Veale and Lemon, and such failure and negligence was a proximate cause of plaintiff being caught out in the cold and his limbs frozen. The evidence supporting these findings is as follows:

[8, 9] According to the testimony of Slaughter, Lemon, and Dr. Veale, they overtook plaintiff and his party about 2:30 p. m. 1¼ miles before reaching Boyd's ranch. Plaintiff was then off the main and direct road upon which he had been started by November. From the point plaintiff was thus overtaken it was 5¼ miles to the dead cow tank, and from the tank to the cowboy camp 8½ miles, making a total distance of only 13¾ miles to the camp. At the meeting a conversation ensued which has been detailed above. Not later than 3 p. m. Slaughter and his companions left plaintiff and drove to the dead cow tank and pulled the cow out of the trough; thence they went to the cowboy camp, where Veale and Lemon vaccinated the calves. The vaccination finished, they left the cowboy camp and went to the headquarters. They left the cowboy camp about 6:30 or 7 o'clock. When they left the camp it had thus been 3½ or 4 hours since they left plaintiff, and he had not yet arrived, although the distance was only 13¾ miles, and Slaughter testified plaintiff should have driven it in 2½ hours. Plaintiff was thus overdue at the camp an hour or an hour and a half when the president, Slaughter, and Lemon, the general manager, left the camp. Plaintiff was not even in sight, and it was shown that it was a level prairie country, and a wagon and team should have been seen a distance of several miles. In view of these circumstances it should have been apparent to both Slaughter and Lemon that something had happened to prevent the arrival of plaintiff at the camp. The wind had been blowing with more or less severity all day, and before the party left the cowboy camp the weather indications were very threatening, and Lemon knew a storm was impending, and told Slaughter a blizzard was coming. Lemon says that he became aware of the impending change in the weather between sundown and dark and before they left the cowboy camp. Slaughter admitted that Lemon at that time and place remarked to him that they were going to have some

"falling weather," and that he (Slaughter) then knew "there was likely to be a very sudden, violent change in the weather." In the meantime plaintiff had arrived at the dead cow tank, and in leaving the same he got on the wrong road, and in this connection it should be said the evidence discloses that there were many trails and some dim roads leading from the tank and that it is not surprising that plaintiff got on the wrong road. At any rate he failed to get on the right road, although he had reached the tank before dark. So it appears that the president, Slaughter, and the manager, Lemon, left the cowboy camp when plaintiff was long overdue thereat, was not in sight, and a sudden and severe change in the weather impending, without taking any precaution to guard plaintiff from the danger incident to the impending change in the weather, doing this with the knowledge, too, that plaintiff and his companions were strangers in that country, had just been brought from a city, and once before earlier in the day had gotten off the road. Notwithstanding the knowledge of all these facts, they hurried to the shelter of the headquarters to escape the coming storm, which Slaughter testified exceeded in severity and intensity any that he had ever known during his 35 years' familiarity with weather conditions in that country. They did this without, before or after leaving the camp, taking any precautions for the safety of plaintiff, and under the circumstances the president and general manager were gravely negligent, and the jury properly so found.' As we understand appellant's assignment and its supporting proposition, its contention is that it owed the plaintiff no duty in the absence of actual knowledge of his perilous situation, but this is not the law. Actual knowledge by the master as an element of liability is not essential. Knowledge of an abnormal danger, which a master might and should have acquired by the exercise of ordinary care, as an element of liability, stands upon precisely the same footing as actual knowledge. This is well established. 3 Labatt on Master and Servant (2d Ed.) §§ 1022 and 1024; Railway Co. v. Shinn, 153 S. W. 636. At section 1028 Mr. Labatt says:

"Where the abnormal conditions which caused the injury are shown to have been originally produced by a cause for which the master was not responsible, the action is or is not maintainable, according as it may appear that he was or was not guilty of a subsequent and distinct breach of duty in having failed to ascertain the existence of those conditions, or in having omitted after discovering them, to take such steps as might be appropriate for the protection of his servants. This principle is applicable where the abnormal conditions resulted from the act of a stranger, or of a fellow servant who is not a vice principal, or to the operation of extraordinary physical force, or to some circumstance which is left wholly unexplained by the evidence."

So it may be conceded that appellant was not responsible for plaintiff becoming lost, but under the facts found by the jury, and in the light of the evidence supporting such findings, it was chargeable with a subsequent and distinct breach of duty in having failed to discover his perilous situation and taking appropriate steps for his protection. Lemon and Slaughter knew before they left the camp that the severe change was impending, and it actually occurred a few minutes after they left the camp and just as they reached headquarters. For the reasons indicated the fourth assignment is overruled.

[10-12] Upon the trial the articles of incorporation of appellant, with an amendment thereto whereby the capital stock was increased from $100,000 to $1,000,000, was offered in evidence by appellee over an objection made that same was irrelevant and immaterial. It is urged that the introduction of the charter showing appellant to be a million-dollar corporation was harmful and prejudicial. The charter was properly admissible in evidence for the purpose of showing that appellant was running a cattle ranch, and not a farm. Further it was evidence of R. L. Slaughter's connection with the corporation and the capacity in which he was connected, as the articles show he was a director. It may be conceded that that portion of the charter showing an increase of its capital stock from $100,000 to $1,000,000 was irrelevant and immaterial, but appellant urged simply a general objection to the admissibility of the charter as a whole. A part being thus admissible, and the objection being to the whole, there was no error in overruling the objection. The court was not required to separate that which was admissible from that which was inadmissible. The objector should do that. Railway Co. v. Gormley, 91 Tex. 393, 43 S. W. 877, 66 Am. St. Rep. 894; Railway Comm. v. Railway Co., 212 S. W. 535.

[13] Under the sixth assignment complaint is made of certain argument of counsel in addressing the jury as being an appeal to passion and prejudice. The argument was made with direct reference to an issue submitted by the court respecting the plea of privilege, and if the argument had any improper effect, it could have influenced only the findings upon this issue. Upon the views heretofore expressed and the admitted facts, venue was properly laid in El Paso county, and there was no occasion to submit any issue of facts to the jury respecting the plea of privilege. Upon this view, appellant could not have been injured by the improper language used. Furthermore, it appears the court stopped counsel from indulging in such argument, and instructed the jury that the language was improper, and not to consider

the same, and gave a written charge to that effect. As to this assignment and to the assignment relating to the admission of the articles of incorporation, it may be further remarked the record in this case discloses that no harmful effect could have resulted from the argument or evidence. The verdict and judgment is for $10,000, and is very reasonable in view of the frightful sufferings of the plaintiff and appalling injuries sustained. No complaint is made of the amount of the verdict. Upon the issues of negligence the jury found against the plaintiff except in the particulars indicated above, and the evidence of its negligence in these particulars fell from the lips of Slaughter, Lemon, and Dr. Veale, and under the circumstances the jury could scarcely have found other than it did find upon these issues. It is thus apparent from the record as a whole that the jury's findings were the result of unbiased and unprejudiced deliberation, and no injury resulted from the improper remarks of counsel or the admission of the evidence indicated.

The seventh assignment is disposed of by the ruling heretofore made.

Affirmed.

### On Rehearing.

We see no reason to recede from the rulings made in this case and overrule appellant's motion for rehearing.

In the opinion it is stated:

"He was furnished by November with a sketch of the road *with full instructions as to the direction in which the headquarters house was situated and as to gates, windmills, tanks, etc., along the road.*"

Appellee objects to the italicized portion of the statement, and an examination discloses that it is too broad. Hence the italicized portion is withdrawn, and in lieu thereof we quote the testimony of Mike November upon the subject, as follows:

"I told him to go to the ranch and get a load of grain, and I told him that there was some bedding there Mr. Slaughter wasn't using, and if he wanted to get that to get it and bring it back. Me and Cruz sat down. The other boys were standing around the wagon all this time, and I made him a map and explained it to him, and he said, 'All right.' I made him a map of this road going to the ranch. There is just one road, and I showed him what side of the mills to go on and what gates to go through. There is only one road going in that direction. After I gave him this map or directions I turned the team over to him, and he got in the wagon and started off. * * * I told Cruz just to stay in that road where I placed him, to stay in it, and there was no other road to turn off, and if he got to the windmills he could see which side of the road to go on. I had marked that on the map. * * * I gave him all the instructions I could to get to that ranch and put him on the road. * * * The road branched off

right there at the camp, and I took him out and started him on the right road, to headquarters. I did not show him the road that led off to the Mallett ranch. I gave him instructions as to all roads because I had orders to, and, as I recall it, there were not many branch roads leading off. Around those two windmills there are all kinds of trails, and I was afraid he would get started up some of those trails. In that country there is a good many windmills, and they have to keep a man to keep them up, and he travels those trails. That is the reason he needed instructions. At the windmills there would be cow paths leading off, but if a stranger got lost in that country he would not be on the road. He would have to get off the road to be lost. That road led to the ranch, and if he followed any of those trails he got on another road. Some of those windmills have roads leading to the ranch. * * *"

Also the testimony of appellee, as follows:

"He gave us a paper showing where windmills were stationed so as to direct ourselves on the road. '* * * Mike drew a diagram on paper showing the windmills and gates we were to go through and the road. He told us about leaving that place, and we left. He showed us the place to get started on and told us about some ranch to inquire about the road from. * * * When we got through eating breakfast, he gave us the instructions how to find the place. * * *"